**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Sharp*, **Slip Opinion No. 2022-Ohio-3702.]**

<u>NOTICE</u>

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-3702

DISCIPLINARY COUNSEL *v*. SHARP.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Sharp*, Slip Opinion No. 2022-Ohio-3702.]**

*Attorneys—Misconduct—Violations of the Rules of Professional Conduct, including failing to act with reasonable diligence in representing a client and engaging in conduct involving dishonesty, fraud, deceit or misrepresentation—Indefinite suspension and restitution ordered.*

(No. 2022-712—Submitted August 2, 2022—Decided October 19, 2022.)

ON CERTIFIED REPORT by the Board of Professional Conduct of the Supreme Court, No. 2021-023.

——————————

**Per Curiam.**

{¶ 1} Respondent, Marianne Kathleen Sharp, formerly of Columbus, Ohio, Attorney Registration No. 0085179, was admitted to the practice of law in Ohio in 2009.

**{¶ 2}** In an eight-count amended complaint filed in January 2022, relator, disciplinary counsel, charged Sharp with multiple ethical violations arising from her conduct in six separate client matters, her handling of her client trust account, and her failure to notify her clients that she did not carry professional-liability insurance. Among those charges were allegations that she had neglected client matters, failed to reasonably communicate with her clients, made false statements to some of her clients about the status of some of their matters, and failed to deliver clients' papers and property and promptly refund their unearned fees upon the termination of the representation.

**{¶ 3}** The parties entered into stipulations of fact and misconduct in which Sharp admitted all but three of the 42 alleged rule violations. After a hearing before a three-member panel of the Board of Professional Conduct, the board issued a report finding that Sharp committed all of the charged misconduct and recommending that she be indefinitely suspended from the practice of law. No objections have been filed. Based on our review of the record and our precedent, we adopt the board's findings of misconduct and recommended sanction.

### Facts and Misconduct

*Count One: The Meadows Matter*

**{¶ 4}** In June 2019, Shawn Meadows retained Sharp to prepare and file a motion to terminate a spousal-support obligation imposed in his Marion County divorce decree. He signed a written fee agreement and paid a $3,000 retainer. On June 21, Meadows met with Sharp and signed the motion. He expected Sharp to file the motion promptly because he was continuing to pay $425 in spousal support every two weeks.

**{¶ 5}** In July and August, Meadows sent Sharp multiple text messages asking about the status of his case. Sharp responded to a few of those communications, reporting that she did not yet have a court date, that the court could not confirm whether service had been perfected, and that she was requesting

2

additional means of service. However, Sharp did not file Meadows's motion until September 5.

{¶ 6} In the following months, Sharp missed a scheduled telephone call with Meadows. At one point, she explained that she had been out of the office "[d]ue to an unforeseen medical issue." The hearing on Meadows's motion was twice delayed—once for failure of service and a second time because of Sharp's hospitalization.

{¶ 7} On the morning of the final hearing in February 2020, Sharp called Meadows to inform him that she was double-booked and that the court would not agree to continue the case. She told him that she would dismiss the motion and refile it by the end of the week at her own expense. Although Sharp dismissed the motion, she never refiled it. Over the following month, Sharp replied to only one or two of Meadows's numerous communications.

{¶ 8} Meadows terminated the representation in March 2020 and requested his file and a full refund, but Sharp did not respond. Meadows later emailed a request for an itemized invoice and stated that he would go to Sharp's office to retrieve his file on March 30. In response, Sharp stated that she was under a health-department quarantine and that her staff would compile an electronic file.

{¶ 9} In mid-April, Meadows informed Sharp that he would file a grievance with relator if he did not receive her response by the close of business that day. Sharp sent Meadows an email later that day stating that $210 of his $3,000 retainer had been paid for the filing fee, leaving $2,790 "towards the retainer." Although the email stated that six documents constituting his file were attached, just three documents were attached. When Meadows asked Sharp to provide the missing attachments, including a time-stamped copy of his motion to terminate spousal support, she stated that she would resend them—but she never did.

{¶ 10} In early May, Meadows sent Sharp an email to inform her that he had filed a grievance with relator. Sharp replied, "My office is finalizing the file

and will submit a refund check via regular mail." Nearly a month later, Meadows informed Sharp that he was tired of waiting, that he was meeting with another lawyer the next day, and that he wanted his file and refund. Sharp falsely claimed that she had issued the refund "through online bill pay" and that because Meadows had noted that he did not receive "the initial mailing," she would email an electronic copy of the file and would send a hard copy by certified mail.

{¶ 11} On July 1, Sharp sent Meadows another email claiming that she had sent him a copy of his file and his refund by certified mail. In her response to relator's letter of inquiry the following week, she claimed that she was sending Meadows his file "by FedEx." Sharp gave relator an invoice for the services she had provided to Meadows, but she never furnished a copy to Meadows and he never received the certified-mail package.

{¶ 12} Meadows later arranged to pick his file up at Sharp's office. But when he emailed Sharp on the appointed day to tell her that he would be at her office within the hour, Sharp replied that for medical reasons, she was unable to be in the office that day.

{¶ 13} In the meantime, Meadows retained another attorney, who filed a motion to terminate his spousal-support obligation. That September, the trial court adopted an agreed judgment entry terminating Meadows's spousal-support obligation, effective December 31, 2020. In January 2022—nearly two years after Meadows first requested a refund from Sharp and just two weeks before her disciplinary hearing—Sharp refunded his full $3,000 retainer.

{¶ 14} The parties stipulated and the board found that Sharp's conduct violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client), 1.4(a)(3) (requiring a lawyer to keep a client reasonably informed about the status of a matter), 1.4(a)(4) (requiring a lawyer to comply as soon as practicable with a client's reasonable requests for information), 1.16(d) (requiring a lawyer to promptly deliver client papers and property as part of the

termination of representation), 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the lawyer's withdrawal from employment), and 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

*Count Two: The M.S. and G.S. Matter*

**{¶ 15}** In July 2018, M.S. retained Sharp to represent his daughter G.S. in connection with charges of underage consumption and possession of false identification that were pending in Franklin County Municipal Court.[1] He executed a third-party fee agreement and paid a flat fee of $1,000 for Sharp to defend G.S. against the criminal charges and to have the record expunged.

**{¶ 16}** Sharp negotiated a plea agreement providing that the charges against G.S. would be dismissed if she completed a diversion program, performed community service, and paid a fine and court costs. G.S. satisfied those requirements, and on August 20, the court dismissed the case. One week later, Sharp filed an application for expungement.

**{¶ 17}** That October, Sharp learned that the prosecutor would object to any motion to expunge the record that was filed within one year of the termination of the case. Sharp withdrew the pending application without notifying or consulting with M.S. or G.S.

**{¶ 18}** That December, M.S. emailed Sharp's assistant to inquire about the status of the expungement. The assistant proposed that M.S. schedule a telephone conference to discuss the case with Sharp. Although M.S. replied with his availability, requested a "quick summary," and made additional inquiries in February 2019, neither Sharp nor her assistant followed up with him.

---

1. For reasons not fully explained in the record, the parties agreed that M.S. and G.S. would be identified only by their initials in this proceeding. However, the panel chair required G.S. to provide her name and identification to the court reporter before she was sworn in as a witness.

**{¶ 19}** Nearly two years later, in December 2020, G.S. applied for employment, but a background check uncovered her municipal-court charges and she did not receive a job offer. Shortly thereafter, M.S. sent Sharp a text message asking her why the record had not been expunged. In response, Sharp stated that she knew she had filed the paperwork but that she would need to check the file. Although she was out of town, she stated that she would follow up with the expungement office "first thing in the morning."

**{¶ 20}** In a January 19, 2021 email, M.S. requested an explanation and accounting by January 25. Sharp acknowledged receipt of that correspondence, stating that she was out of the office for medical reasons but that she would "review" it when she returned. Although Sharp responded to M.S.'s communications following up on his request, she never offered substantive answers to his inquiries or obtained an expungement of G.S.'s record.

**{¶ 21}** M.S. eventually hired new counsel, who obtained the expungement in September 2021. Sharp refunded $300 of M.S.'s retainer in January 2022.

**{¶ 22}** In accord with the parties' stipulations, the board found that Sharp's conduct violated Prof.Cond.R. 1.2(a) (requiring a lawyer to abide by a client's decisions concerning the objectives of representation and to consult with the client as to the means by which they are to be pursued), 1.3, 1.4(a)(3), 1.4(a)(4), and 1.16(e). In addition, the board found that Sharp engaged in dishonest conduct in violation of Prof.Cond.R. 8.4(c).

*Count Three: The Aqel Matter*

**{¶ 23}** In September 2019, Maysa Aqel retained Sharp to represent her in connection with her pending divorce. She paid a $3,500 retainer in installments. Thereafter, Aqel had difficulty communicating with Sharp, and after Sharp was unable to attend a scheduled hearing, Aqel decided to negotiate with her estranged husband through a nonlawyer third party.

**{¶ 24}** In February 2020, Aqel and her husband reached an agreement. Sharp told opposing counsel that she would draft the divorce decree and related documents. Sharp gave Aqel several false assurances that the documents were forthcoming—and twice sent emails falsely stating that the documents were attached. Although Sharp never sent those documents to Aqel, she told opposing counsel that she was waiting for Aqel to approve them.

**{¶ 25}** Aqel terminated Sharp's representation in August 2020. Sharp promised to return Aqel's file, send an itemized bill, and file a motion to withdraw. Despite multiple requests from Aqel and opposing counsel, Sharp did not file a notice of withdrawal, nor did she return Aqel's file. She eventually provided relator a copy of an invoice that she prepared in August 2020, but she never gave that invoice to Aqel. In January 2022, Sharp refunded $1,500 of Aqel's retainer.

**{¶ 26}** The parties stipulated and the board found that Sharp's conduct violated Prof.Cond.R. 1.3, 1.4(a)(4), and 1.16(d). During her disciplinary hearing, Sharp testified that she believed that she had prepared Aqel's separation agreement, but the board found that her testimony was not credible, because she never provided the agreement to Aqel or opposing counsel despite having sent at least two emails in which she claimed that she had transmitted the document. Consequently, the board also found that Sharp engaged in dishonest conduct in violation of Prof.Cond.R. 8.4(c).

*Counts Four and Five: The Snider and Meachem Matters*

**{¶ 27}** In 2021, Sharp agreed to represent Tyson Snider and Chelsea Meachem in separate stepparent adoption matters in Marion County for flat fees of approximately $2,000 plus court costs. Sharp did not deposit all of the advanced legal fees she received from those clients into her client trust account—and she withdrew those that were deposited into that account before they were earned.

**{¶ 28}** As described below, Snider and Meachem each scheduled multiple meetings with Sharp to review and sign the necessary paperwork but Sharp

canceled those meetings, often for personal reasons. For example, following a month of delays, Meachem texted Sharp to inform her that her ex-husband intended to seek visitation with the children. In response, Sharp promised to email documents to Meachem for her review and agreed to meet with her the next day so that she could sign the documents and get them filed as soon as possible. However, Sharp failed to send Meachem the documents and stopped responding to her communications. Meachem promptly terminated the representation and asked Sharp to return her file and retainer.

**{¶ 29}** In a similar fashion, Sharp canceled four meetings with Snider before finally meeting with him in late April to have him sign the adoption petitions. Snider expected Sharp to promptly file them in the probate court, but over the next several months, Sharp responded only sporadically to Snider's communications and did not update him on the status of the case.

**{¶ 30}** Over the summer, Sharp represented to Snider in one or more telephone conversations that the adoption petitions had been filed. Unable to obtain the case number from Sharp, Snider called the court on October 4 and found out that she had never filed the petitions. The next day, Sharp admitted that Snider was entitled to a full refund and agreed to return his file.

**{¶ 31}** Sharp misled both Snider and Meachem about the status of their refunds, but she finally issued them shortly before her disciplinary hearing. Sharp never returned their files.

**{¶ 32}** The parties stipulated and the board found that Sharp's conduct in each of these matters violated Prof.Cond.R. 1.3, 1.4(a)(3), 1.4(a)(4), 1.15(a) (requiring a lawyer to hold the property of clients in an interest-bearing client trust account, separately from the lawyer's own property), 1.15(c) (requiring a lawyer to deposit advance legal fees and expenses into a client trust account, to be withdrawn by the lawyer only as fees are earned or expenses incurred), 1.16(d), 1.16(e), and 8.4(c).

*Count Six: Client-Trust-Account Violations*

**{¶ 33}** In July 2021, relator received two notices from Sharp's bank indicating that she had overdrawn her client trust account. In each instance, Sharp issued a check to herself for hundreds of dollars when the account contained less than $25. Upon relator's inquiry, Sharp was unable to state the purpose of those checks or to demonstrate that she was entitled to receive those funds as earned fees.

**{¶ 34}** On further investigation, relator discovered several other irregularities with Sharp's handling of her client trust account. Sharp twice commingled personal and client funds by depositing checks for earned fees and/or the reimbursement of business expenses into her client trust account. She improperly paid personal and business expenses, including political contributions and rent for her home and office, directly from her client trust account. Since at least 2018, Sharp also failed to maintain individual ledgers for each client whose funds were deposited into her client trust account, to maintain a general ledger for that account, and to reconcile that account on a monthly basis. In addition, Sharp routinely wrote checks to herself, transferred funds to her operating account, and withdrew cash from her client trust account based solely on her own estimates of the fees she had earned.

**{¶ 35}** The parties stipulated and the board found that Sharp's conduct violated Prof.Cond.R. 1.15(a), 1.15(a)(2) (requiring a lawyer to maintain a record for each client on whose behalf funds are held), 1.15(a)(3) (requiring a lawyer to maintain a record for the lawyer's client trust account, setting forth the name of the account, the date, amount, and client affected by each credit and debit, and the balance in the account), 1.15(a)(5) (requiring a lawyer to perform and retain a monthly reconciliation of the funds held in the lawyer's client trust account), 1.15(b) (permitting a lawyer to deposit his or her own funds into a client trust account for the sole purpose of paying or obtaining a waiver of bank service charges), and 1.15(c).

*Count Seven: The Reynolds Matter*

**{¶ 36}** In April 2019, Mac Reynolds retained Sharp to file for divorce on his behalf. He signed a written fee agreement in which he agreed to pay a $2,000 retainer and $200 an hour plus costs for Sharp's services. In 2021, Reynolds retained Sharp and paid her another $500 to pursue the expungement of a decades-old criminal conviction.

**{¶ 37}** Sharp filed Reynolds's divorce complaint shortly after he retained her. In February 2020, however, Sharp informed the court that the uncontested divorce hearing could not go forward, because Reynolds's wife had recently given birth. Based on Reynolds's representations that he would be seeking paternity testing and filing an amended complaint, the court did not reschedule the hearing. Approximately seven months later, the court issued a notice for Reynolds to show cause why the case should not be dismissed for lack of prosecution. Sharp did not inform Reynolds of that notice or the court's subsequent dismissal of the case, nor did she refile the complaint. In late 2020, she falsely told Reynolds that she had filed the complaint in a different county. She later told him that she was awaiting hearing dates for the divorce and the expungement when, in fact, neither case had been filed.

**{¶ 38}** While investigating Sharp's client trust account in December 2021, relator informed Reynolds that his case had been dismissed more than a year earlier. Shortly thereafter, Reynolds reached out to Sharp and she told him that she would pay another attorney $750 to handle both of Reynolds's legal matters. But Sharp filed Reynolds's motion to expunge Reynolds's criminal conviction on December 17 and refiled his complaint for divorce shortly before her January 28, 2022 disciplinary hearing. Sharp never provided Reynolds with invoices for her services. She has agreed that he is entitled to a refund of the entire $2,900 he paid her, but at the time of her disciplinary hearing, she had not refunded the money.

{¶ 39} The parties stipulated that Sharp's conduct violated Prof.Cond.R. 1.3 and 1.4(a)(3). The board agreed and also found that she engaged in dishonest conduct in violation of Prof.Cond.R. 8.4(c).

*Count Eight: Professional-Liability Insurance*

{¶ 40} Sharp's professional-liability insurance policy expired on February 17, 2018, and she did not renew it. But Sharp never informed any of the clients identified in this case that she did not maintain professional-liability insurance. Nor did she have any client sign a written acknowledgment of that fact. The parties stipulated and the board found that her conduct violated Prof.Cond.R. 1.4(c) (requiring a lawyer to inform a client if the lawyer does not maintain professional-liability insurance and obtain a signed acknowledgment of that notice from the client).

**This Court Adopts the Board's Findings of Misconduct**

{¶ 41} After a thorough review of the record, we adopt the board's findings of misconduct with respect to each of the eight counts in this case.

**Sanction**

{¶ 42} When imposing sanctions for attorney misconduct, we consider all relevant factors, including the ethical duties that the lawyer violated, the aggravating and mitigating factors listed in Gov.Bar R. V(13), and the sanctions imposed in similar cases.

{¶ 43} As aggravating factors, the board found that Sharp had acted with a dishonest motive by collecting retainers and fees without providing the agreed services, lying to her clients, and concealing her inaction from them. *See* Gov.Bar R. V(13)(B)(2). The board also found that she had engaged in a pattern of misconduct involving multiple offenses, causing harm to six vulnerable clients. *See* Gov.Bar R. V(13)(B)(3), (4), and (8). The board acknowledged that Sharp had refunded money to Meadows, M.S., Aqel, Snider, and Meachem shortly before her

disciplinary hearing, but the board noted that she still owes Reynolds $2,900, *see* Gov.Bar R. V(13)(B)(9).

{¶ 44} As for mitigation, the board found that Sharp has no prior discipline and that she had exhibited a cooperative attitude toward the disciplinary proceedings. *See* Gov.Bar R. V(13)(C)(1) and (4). Although Sharp submitted four letters from three attorneys and a personal friend attesting to her good character, the board afforded them little weight because the authors had not been informed of the specific allegations contained in relator's amended complaint. *See* Gov.Bar R. V(13)(C)(5). Sharp testified about and provided documentation of a chronic illness that she experienced around the time of her misconduct and a subsequently diagnosed mental disorder. However, she did not seek to qualify either condition as a mitigating factor pursuant to Gov.Bar R. V(13)(C)(7).

{¶ 45} In determining the appropriate sanction for Sharp's misconduct, the board started with the presumption that disbarment is the appropriate sanction for misappropriation of client funds. *See, e.g.*, *Cleveland Bar Assn. v. Belock*, 82 Ohio St.3d 98, 100, 694 N.E.2d 897 (1998). That presumption, however, "may be tempered with sufficient evidence of mitigating or extenuating circumstances." *Disciplinary Counsel v. Edwards*, 134 Ohio St.3d 271, 2012-Ohio-5643, 981 N.E.2d 857, ¶ 18.

{¶ 46} The board recommends that we deviate from the presumptive sanction of disbarment in this case and that in addition to indefinitely suspending Sharp, we require her to make restitution to Reynolds within 60 days and condition her reinstatement on proof of compliance with her December 2021 OLAP contract and any extension thereof.

{¶ 47} In support of that recommendation, the board cites several cases in which we imposed indefinite suspensions for comparable misconduct. For example, in *Disciplinary Counsel v. Schiller*, 123 Ohio St.3d 200, 2009-Ohio-4909, 915 N.E.2d 324, an attorney accepted retainers from bankruptcy clients, failed to

diligently represent clients, failed to reasonably communicate with a client, and failed to inform clients that he did not carry professional-liability insurance. Despite Schiller's assurances that he would file his clients' bankruptcy petitions, he failed to file four cases, he failed to *timely* file one other, and two cases were dismissed for his failure to comply with court orders. In addition, Schiller misappropriated tax refunds belonging to three clients and attempted to conceal his wrongdoing.

{¶ 48} Although Schiller engaged in a pattern of misconduct involving multiple offenses, caused harm to vulnerable clients, and still owed restitution of approximately $7,000 to his clients, he had no prior discipline and exhibited a cooperative attitude toward the disciplinary proceedings. We indefinitely suspended Schiller from the practice of law, required him to make restitution, and ordered that a two-year period of monitored probation be imposed upon his reinstatement to the profession.

{¶ 49} In *Cleveland Metro. Bar Assn. v. Gruttadaurio*, 136 Ohio St.3d 283, 2013-Ohio-3662, 995 N.E.2d 190, we indefinitely suspended an attorney for failing to perform work for two clients from whom he had accepted retainers. Like Sharp, Gruttadaurio also failed to reasonably communicate with clients, to return the unearned portion of his fee, and to inform clients that he did not maintain professional-liability insurance. Gruttadaurio also made false statements about his conduct to the relator's investigator. In mitigation, Gruttadaurio had a clean disciplinary record and exhibited a cooperative attitude toward the disciplinary process—but he did not act with a selfish or dishonest motive as Sharp did in this case.

{¶ 50} More recently, in *Disciplinary Counsel v. Petracci*, 163 Ohio St.3d 164, 2021-Ohio-249, 168 N.E.3d 500, an attorney engaged in misconduct similar to Sharp's by neglecting four client matters, misappropriating client retainers and settlement proceeds, and lying to her clients about the status of their matters. In

addition, Petracci engaged in conduct that was prejudicial to the administration of justice, and in the course of the ensuing disciplinary investigation, she made false statements and material omissions and gave false deposition testimony. Although Petracci engaged in a pattern of misconduct involving multiple offenses and still owed more than $7,500 in restitution to her clients, she had no prior discipline, acknowledged the wrongfulness of her misconduct, and expressed sincere remorse for it. We indefinitely suspended Petracci for her misconduct.

{¶ 51} After considering Sharp's misconduct, the relevant aggravating and mitigating factors, and our precedent, we are convinced that an indefinite suspension is the appropriate sanction in this case.

### Conclusion

{¶ 52} Accordingly, Marianne Kathleen Sharp is indefinitely suspended from the practice of law in Ohio and ordered to make restitution of $2,900 to Mac Reynolds within 60 days. In addition to the requirements for reinstatement set forth in Gov.Bar R. V(25), Sharp shall be required to submit proof that she has complied with her December 2021 OLAP contract and any extension thereof. Costs are taxed to Sharp.

Judgment accordingly.

O'CONNOR, C.J., and KENNEDY, FISCHER, DEWINE, DONNELLY, STEWART, and BRUNNER, JJ., concur.

––––––––––––––––

Joseph M. Caligiuri, Disciplinary Counsel, and Martha S. Asseff and Audrey E. Varwig, Assistant Disciplinary Counsel, for relator.

Ulmer & Berne, L.L.P., and Alvin E. Mathews Jr., for respondent.

––––––––––––––––